Filed 4/29/16  P. v. Escalona CA2/3

## NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION THREE

| | |
|---|---|
| THE PEOPLE, | B262572 |
| Plaintiff and Respondent, | (Los Angeles County Super. Ct. No. VA123111) |
| v. | |
| EDSON ESCALONA et al., | |
| Defendants and Appellants. | |

APPEAL from judgments of the Superior Court of Los Angeles County, Raul A. Sahagun, Judge.  Affirmed.

Janet J. Gray, under appointment by the Court of Appeal, for Defendant and Appellant, Edson Escalona.

Sally Patrone Brajevich, under appointment by the Court of Appeal, for Defendant and Appellant, David Leyvas Moreno.

Kamala D. Harris, Attorney General, Gerald A. Engler, Chief Assistant Attorney General, Lance E. Winters, Assistant Attorney General, Paul M. Roadarmel, Jr. and Connie H. Kan, Deputy Attorneys General, for Plaintiff and Respondent.

Defendants David Leyvas Moreno and Edson Escalona appeal their convictions of, respectively, attempted murder and attempted voluntary manslaughter. Although Moreno and Escalona were tried jointly, they had separate juries. Their appeals have been consolidated.

For the reasons discussed below, the judgments are affirmed.

## PROCEDURAL BACKGROUND

Moreno and Escalona were charged with attempted willful, deliberate, and premeditated murder, and various enhancements, arising from the shooting of Bernardo Alfonso. (Pen. Code,[1] §§ 664, 187, subd. (a); count 1.) Escalona was separately charged with resisting, delaying, or obstructing a peace officer.[2] (§ 148, subd. (a)(1); count 2.)

Moreno was found guilty of attempted premeditated murder. The jury acquitted Escalona of attempted premeditated murder, but convicted him of the lesser included offense of attempted voluntary manslaughter and of the separate offense of resisting a peace officer. The jury also found all the special allegations to be true.

## FACTUAL BACKGROUND

Viewed in accordance with the usual rule of appellate review (*People v. Ochoa* (1993) 6 Cal.4th 1199, 1206) the evidence established the following.

1. *Prosecution Evidence.*

Billy Perkins testified that on the afternoon of December 28, 2011, he was at a bar called the Torch Room in a commercial area at the intersection of Domart and Imperial Streets in the City of Norwalk. At about 1:00 p.m., he saw Bernardo Alfonso, whom he knew as "Ben." Alfonso then left, saying he would be returning. As Alfonso left the Torch Room, Moreno and Escalona arrived by car. They got out of the car and approached Perkins. Moreno seemed angry and asked Perkins if his name was Ben because he was looking for a man by that name. Moreno also asked if Perkins knew a

---

[1]    All further statutory references are to the Penal Code unless otherwise specified.

[2]    Though he was convicted of this charge, Escalona does not challenge this conviction on appeal.

2

woman named "Cinderella." Perkins told him that both Ben and Cinderella had been at the bar earlier, but that they both had left. After Moreno paced up and down in front of the Torch Room for a while, he approached Perkins again and accused him of lying about Alfonso's whereabouts. Perkins walked away from Moreno. Five or ten minutes later, Alfonso drove up and parked his car. Moreno and Escalona walked toward him.

Alfonso testified he had driven to the Torch Room that day with a woman named Martha who was also known as "Cinderella." He left the bar to pick up a woman named Vanessa and then drove back to the Torch Room with her. When they arrived, Vanessa went into a nearby store. Alfonso was sitting alone in his car when Moreno approached him from the driver's side. Alfonso's door was closed so Moreno spoke to him through the car's sunroof. Escalona was standing behind Moreno. Moreno asked Alfonso if he was the "Candyman," which Alfonso denied. Moreno then asked Alfonso if he had any drugs. When Alfonso told him "no," Moreno said, "This is my neighborhood," and asked if Alfonso had any money. After Alfonso denied having any money, Moreno walked to the front of Alfonso's car. As Alfonso started getting out of his car, he saw that Moreno was pointing a gun at him. Alfonso testified Moreno made some kind of gun-cocking motion with his hand and then said: " 'It's jammed.' And then he says, 'Shoot him. Shoot him.' " A few seconds later, Alfonso was fired on from his left side, where Escalona was standing. Alfonso was shot six times.

When the shooting stopped, Moreno and Escalona ran into a nearby alleyway. They were not apprehended until later: Moreno on January 5, 2012; Escalona on January 10, 2012.

Detective Philip Fernandez, one of the responding officers to the shooting scene, testified that when he interviewed Alfonso two days later, Alfonso said that Moreno had "looked at [Escalona] and yelled, 'Shoot him, he's in our neighborhood.' "

A number of sheriff's deputies testified that both defendants were self-admitted members of the Neighborhood Norwalk gang. Moreno, the older and far more senior gang member, had numerous tattoos related to the gang on his hand, arm, back, and head.

3

The People introduced evidence from a gang expert, Detective Ivania Farias, a veteran officer with the Los Angeles County Sheriff's Department. Farias testified that she had handled "numerous cases involving the Neighborhood Norwalk gang" for about five years. She opined that the gang's primary activities included attempted murder, robbery, and drug dealing.[3]

2. *Defense Evidence.*

Moreno testified he had been about 38 years old at the time of the shooting. He originally joined the Neighborhood Norwalk gang when he was 14 years old.

Moreno admitted that he went to the Torch Room on the day of the shooting to confront Alfonso, who was known to him as the "Candyman," because he had heard that Alfonso was selling drugs there. Moreno testified he took a gun with him because he had "heard . . . about this guy Candyman, that he carried a weapon, that he was from out of state and that he didn't mess around." Moreno asserted his only intention was "to let [Alfonso] know he couldn't be selling drugs there." Moreno explained that he himself had been selling drugs to support his family and that he needed to do something because Alfonso was stealing his customers.

Moreno testified he approached Alfonso's car and asked if he was the Candyman and if he was selling drugs in the area. When Alfonso said no, Moreno told him that if he was selling drugs in the area he had to stop. Moreno denied asking Alfonso for money. As Moreno started walking away, he noticed Alfonso getting out of the car with something in his hand: ". . . I didn't quite know what it was. Being prior [*sic*] to the things that I've heard about him, I was thinking that he was trying to pull out a gun out on me as I'm walking away. So as I'm walking away, I turn around to pull out my gun. As I pull out my gun, I'm fumbling with it [at] that point. I hear the gunshots. I think he's shooting at me; so I started to run." Moreno denied having ordered Escalona to shoot Alfonso.

---

[3]    Farias's testimony is discussed in greater detail in the body of this opinion.

4

Escalona, who was 18 years old at the time of the shooting, testified he had been a member of the Neighborhood Norwalk gang since he was 15 or 16. Escalona testified he was present that afternoon in front of the Torch Room bar because Moreno "had told me to go – he was going to talk to this guy regarding a[n] issue right there, the dope business or whatnot." Asked what he had heard about "this guy," Escalona said: "That he was right there calling himself a Candyman trying to sell drugs around that area." Escalona acknowledged that the Torch Room is considered to be in Neighborhood Norwalk gang territory.

Escalona testified that when Alfonso opened his car door, "from my point of view looked like he opened it like in an aggressive manner," and "[t]he way he jumped on [*sic*] the car didn't seem right to me. By the time he was at the car, I saw what I believed was a firearm in his hand." Escalona reacted to this by pulling out his own gun and shooting Alfonso: "I remember shooting him one time, and by that time he had already exited the vehicle. I mean, it scared me. This guy's pretty big. I shot him one time. I didn't think I hit him because he continued to walk towards me. So at that point I closed my eyes and I kept firing."

Escalona acknowledged that his allegiance to the Neighborhood Norwalk gang was based on the fact that they were like his family; he would protect them, just like he had protected Moreno[4]:

"Q. You would get down for them, back them up; right?

"A. Yes.

"Q. Just like you backed up Mr. Moreno on December 28, 2011; right?

"A. Yes."

---

[4]     Escalona testified: "Q. And part of joining a gang is that not only are you going to do [anything to protect] them, but they're going to do it for yourself, as well; right? They're going to protect you? [¶] A. I would expect to. [¶] Q. Right. Because you all are part of the same gang; right? [¶] A. Yes."

3. *Trial outcome*.

Moreno's jury convicted him of premeditated attempted murder with prior prison term, prior serious felony conviction, gang enhancement, and firearm use findings (§§ 664, 187, 667.5, 667, subds. (b)-(i), 186.22, subd. (b), 12022.53). Escalona's jury convicted him of attempted voluntary manslaughter and resisting a peace officer, with gang enhancement and firearm use findings (§§ 664, 192, 148, subd. (a)(1), 186.22, subd. (b), 12022.5).

Moreno was sentenced to 39 years to life in prison. Escalona was sentenced to 28 years six months in prison.

## CONTENTIONS

Moreno and Escalona contend their gang enhancements must be reversed because there was insufficient evidence to support the juries' true findings. Escalona separately contends that his conviction must be reversed because the trial court improperly coerced a verdict from a deadlocked jury. Moreno separately contends that his conviction must be reversed because the trial court should have dismissed a juror for misconduct.

## DISCUSSION

1. *There Was Sufficient Evidence to Support the Juries' True Findings on the Gang Enhancements.*

Defendants contend that the juries' true findings on the gang enhancements should be reversed for insufficient evidence to establish several necessary elements. We disagree.

a. *Legal principles.*

"In considering a challenge to the sufficiency of the evidence to support an enhancement, we review the entire record in the light most favorable to the judgment to determine whether it contains substantial evidence – that is, evidence that is reasonable, credible, and of solid value – from which a reasonable trier of fact could find the defendant guilty beyond a reasonable doubt. [Citation.] We presume every fact in support of the judgment the trier of fact could have reasonably deduced from the evidence. [Citation.] If the circumstances reasonably justify the trier of fact's findings,

6

reversal of the judgment is not warranted simply because the circumstances might also reasonably be reconciled with a contrary finding. [Citation.] 'A reviewing court neither reweighs evidence nor reevaluates a witness's credibility.' [Citation.]" (*People v. Albillar* (2010) 51 Cal.4th 47, 59-60 (*Albillar*).)

"Section 186.22, subdivision (b)(1) imposes additional punishment when a defendant commits a felony for the benefit of, at the direction of, or in association with a criminal street gang. To establish that a group is a criminal street gang within the meaning of the statute, the People must prove: (1) the group is an ongoing association of three or more persons sharing a common name, identifying sign, or symbol; (2) one of the group's primary activities is the commission of one or more statutorily enumerated criminal offenses; and (3) the group's members must engage in, or have engaged in, a pattern of criminal gang activity. [Citations.]" (*People v. Duran* (2002) 97 Cal.App.4th 1448, 1457 (*Duran*).) In addition, "the prosecution must prove that the crime for which the defendant was convicted had been 'committed for the benefit of, at the direction of, or in association with any criminal street gang, with the specific intent to promote, further, or assist in any criminal conduct by gang members.' (§ 186.22, subd. (b)(1).)" (*People v. Gardeley* (1996) 14 Cal.4th 605, 616-617 (*Gardeley*).)

Regarding the "primary activity" element, "the trier of fact must find that one of the alleged criminal street gang's primary activities is the commission of one or more of certain crimes listed in the gang statute. In [*Gardeley*] that requirement was satisfied by the testimony of a police gang expert who expressed his opinion that the primary activities of the group in question were drug dealing and witness intimidation, both statutorily listed crimes." (*People v. Sengpadychith* (2001) 26 Cal.4th 316, 322.) "The phrase 'primary activities,' as used in the gang statute, implies that the commission of one or more of the statutorily enumerated crimes is one of the group's 'chief' or 'principal' occupations. [Citation.] That definition would necessarily exclude the occasional commission of those crimes by the group's members. . . . [¶] Sufficient proof of the gang's primary activities might consist of evidence that the group's members *consistently and repeatedly* have committed criminal activity listed in the gang statute."

7

(*Id.* at pp. 323-324.)  "The testimony of a gang expert, founded on his or her conversations with gang members, personal investigation of crimes committed by gang members, and information obtained from colleagues in his or her own and other law enforcement agencies, may be sufficient to prove a gang's primary activities. [Citations.]"  (*Duran*, *supra*, 97 Cal.App.4th at p. 1465.)

b. *There was substantial evidence that the gang's primary activities included enumerated offenses.*

During trial, the prosecutor asked Detective Farias if there were any primary activities the Neighborhood Norwalk gang engaged in.  Farias answered:  "Yes. Murders, attempted murders, assault with a deadly weapon[], whether it's firearms or any other instrument.  We have vehicle thefts, drug dealing, street robberies."  Defendants argue this testimony was insufficient to establish the primary activities element of the gang enhancement because Farias did not cite a specific basis for her opinion, might have had only limited contact with the gang, and could have been relying on unreliable sources.  These arguments are unpersuasive.

Robberies, murders, aggravated assaults and drug dealing are qualifying crimes for the "primary activity" element of the gang statute.  (§ 186.22, subds. (e) & (f).) Testimony like Farias's has often been found sufficient to establish that a gang's primary activities include one or more of the enumerated crimes.  (Compare *People v. Vy* (2004) 122 Cal.App.4th 1209, 1219 [testimony that aggravated assaults and attempted murder "were among . . . the primary activities" of the gang proved primary activity element] and *In re Ramon T.* (1997) 57 Cal.App.4th 201, 207 [testimony that gang "engaged in several of the crimes listed in section 186.22 as a primary activity" proved primary activity element] with *People v. Perez* (2004) 118 Cal.App.4th 151, 160 [testimony about gang's "history of racial hatred and violent acts toward Asians" failed to prove primary activity element].)

The testimony before the jury supports the conclusion that Detective Farias's opinion about the Neighborhood Norwalk gang's primary activities was based on reliable information.  She explained that she speaks to gang members on a daily basis, both

8

formally and informally, to gather intelligence about their crimes and culture. Farias estimated she had had formal and informal contact with hundreds of gang members. She testified specifically about Neighborhood Norwalk's activities and identified Neighborhood Norwalk as one of the gangs she was assigned to monitor. Farias demonstrated her knowledge of the gang by identifying Neighborhood Norwalk tattoos, its various nicknames, its rival gangs, and the physical boundaries of its gang territory. Within a few pages of her primary activity testimony, Farias explained that she had been familiar with this gang for five years, saying: "I have . . . handled numerous cases involving the Neighborhood Norwalk gang. I've . . . conducted probation and parole and search warrants at homes of gang members in the Neighborhood Norwalk gang. I've talked to other deputies and detectives within the sheriff's department and outside in neighboring agencies." Thus, based on the record before us, we conclude that there was a reliable basis for Farias's opinion as to Neighborhood Norwalk's primary activities.

In their attempt to impeach the reliability of Farias's expert opinion, defendants cite *In re Alexander L.* (2007) 149 Cal.App.4th 605 (*Alexander L.*), *In re Nathaniel C.* (1991) 228 Cal.App.3d 990 (*Nathaniel C.*), and *In re Leland D.* (1990) 223 Cal.App.3d 251 (*Leland D.*). Their reliance on these cases is misplaced.

In *Alexander L.* the expert testified only: " 'I know they've committed quite a few assaults with a deadly weapon, several assaults. I know they've been involved in murders. [¶] I know they've been involved with auto thefts, auto/vehicle burglaries, felony graffiti, narcotic violations.' " (*Alexander L.*, *supra*, 149 Cal.App.4th at p. 611.) This testimony was deemed insufficient because the expert "did not directly testify that criminal activities constituted [the gang's] primary activities. Indeed, on cross-examination, [the expert] testified that the vast majority of cases . . . he had run across were graffiti related." (*Id*. at pp. 611-612, fn. omitted.) Here, in contrast, Farias testified consistently that the Neighborhood Norwalk gang's *primary activities* included crimes enumerated in the gang enhancement statute.

*Alexander L.* also held the expert's testimony lacked an adequate foundation "because information establishing reliability was never elicited from him at trial. It is

9

impossible to tell whether his claimed knowledge of the gang's activities might have been based on highly reliable sources, such as court records of convictions, or entirely unreliable hearsay." *(Alexander L., supra*, 149 Cal.App.4th at p. 612, fns. omitted.) But here, Farias testified she had been personally involved in investigating crimes committed by the Neighborhood Norwalk gang for at least five years, which demonstrated the reliability of her opinion regarding the gang's primary activities. (See *Duran, supra*, 97 Cal.App.4th at p. 1465 [expert testimony based on "personal investigation of crimes committed by gang members" may be sufficient to prove primary activity element].)

*Nathaniel C.* and *Leland D.* are also inapposite. In *Nathaniel C., supra*, 228 Cal.App.3d at p. 1004, the prosecution evidence in support of the primary activities element was deemed insufficient because the gang expert's testimony did not specifically relate to the particular gang at issue or its activities. In fact, the expert noted that the gang was not actually within his jurisdiction.[5] Similarly, in *Leland D.*, when the gang expert was asked if the gang had committed any serious felony after September 1988, the expert replied: "I don't know. I'm sure there has been, but I don't know." (*Leland D., supra*, 223 Cal.App.3d at p. 259.) This was held to be insufficient: "Freeman's testimony falls far short of what is required to prove 'the commission, attempted commission, or solicitation of two or more of the [statutorily enumerated] offenses' (§ 186.22, subd. (e)) within the requisite three-year time period so as to establish that the Fink White Deuces 'engaged in a pattern of criminal activity.' " (*Id.* at pp. 259-260.) In the present case, in contrast, as we have said, Farias demonstrated detailed knowledge of the relevant gang.

---

[5] "The only testimony even remotely addressing this element is the expert's statement that the primary activity of all of the gangs in his area is criminal. The expert then gave a general list of the crimes he had in mind, only one of which – assault with a deadly weapon – is included among the eight offenses specified in the statute. The expert did not identify the Family as one of the gangs in his area. Indeed, the expert made a point of stating that the Family's base is in San Bruno rather than his jurisdiction, South San Francisco. While we consider this element to be a proper subject of expert opinion, here the opinion did not relate specifically to the Family and its activities." (*Nathaniel C., supra*, 228 Cal.App.3d at pp. 1004-1005.)

c. *There was substantial evidence that Moreno acted with the "specific intent" to aid members of his gang.*

"The enhancement set forth in section 186.22(b)(1) does not risk conviction for mere nominal or passive involvement with a gang. Indeed, it does not depend on membership in a gang at all. Rather, it applies when a defendant has personally committed a gang-related felony *with the specific intent* to aid members of that gang." (*Albillar*, *supra*, 51 Cal.4th at pp. 67-68, italics added.) Moreno claims there was insufficient evidence to satisfy the specific intent element because Detective Farias's testimony was the only evidence that the crime had been committed for the benefit of the gang. We disagree.

Moreno points out that he himself testified he sold drugs only for his personal benefit and that he could not afford to share his drug profits with the gang. Referring to Farias's testimony that a gang member selling drugs within the gang's territory would have to share the profits with the gang, Moreno explained that because he had been in the gang so long he had attained a kind of seniority and, since the gang knew he was just dealing small amounts to support his family, they did not require him to pay the usual tax: "[M]ost of the guys there they know my circumstances of why I was back doing what I was doing. I wasn't doing it for the benefit of nobody but for myself and my family. [¶] Now, if I was on the level of benefitting them, for sure they would want what they got coming. But it was not for them, it was for myself and for my family."

Citing *People v. Ferraez* (2003) 112 Cal.App.4th 925, Moreno contends the trial evidence was insufficient to prove that he was selling drugs with the specific intent of aiding his gang because the expert's testimony alone was not sufficient to prove the drug offense was gang related. However, we disagree with this characterization of the case law and the evidence. *Ferraez* noted that "[u]ndoubtedly, the expert's testimony alone would not have been sufficient to find the drug offense was gang related," but then went on to hold that the expert's testimony was coupled with other evidence from which the jury could reasonably infer the crime was gang related. (*Id.* at p. 931.)

11

In the present case, as in *Ferraez*, there was evidence from which the jury could reasonably infer Moreno was not just in business for himself, and that the shooting of Alfonso was gang related. In preparation for his intended confrontation with Alfonso, Moreno told Escalona, a fellow gang member, to serve as his armed backup. The confrontation took place at the Torch Room, a location within the territory claimed by Moreno's Neighborhood Norwalk gang. At the very start of the confrontation, Moreno told Alfonso, "This is my neighborhood." The very words Moreno used when he ordered Escalona to shoot Alfonso indicated that the reason for the confrontation was to protect Neighborhood Norwalk gang territory: "*Shoot him, he's in our neighborhood.*" (Italics added.) Finally, when Moreno was asked during cross-examination who told him that the "Candyman" was at the Torch Room, Moreno responded "somebody that *we* sell drugs to." (Italics added.) A rational jury could have reasonably viewed this testimony as tending to show that Moreno had been lying when he claimed that his drug-selling activities had nothing to do with his gang.

Thus, substantial circumstantial evidence established that Moreno committed attempted murder with the specific intent of benefitting his gang.

d. *There was substantial evidence that Escalona acted with the "specific intent" to aid members of his gang.*

Escalona first contends the People failed to prove that he "commit[ed] [a felony] for the benefit of, at the direction of, or in association with a criminal street gang." (§ 186.22, subd. (b).) He asserts: "Mere commission of a crime with another gang member does not establish [the 'in association with'] element. Here, the prosecution presented no evidence that the perpetrators had relied on the 'apparatus of the gang' to commit the instant crime." Not so. (See *Albillar*, *supra*, 51 Cal.4th at p. 62 ["defendants came together *as gang members* to attack [the victim] and, thus . . . they committed these crimes in association with the gang"]; *People v. Morales* (2003) 112 Cal.App.4th 1176, 1198 ["the jury could reasonably infer the requisite association from the very fact that defendant committed the charged crimes in association with fellow gang members"].)

12

Like Moreno, Escalona contends Detective Farias's expert testimony was insufficient to prove that he acted with the specific intent to promote, further, or assist gang conduct. However, "if substantial evidence establishes that the defendant intended to and did commit the charged felony with known members of a gang, the jury may fairly infer that the defendant had the specific intent to promote, further, or assist criminal conduct by those gang members." (*Albillar*, *supra*, 51 Cal.4th at p. 68.) Here, there was ample evidence Escalona intended to assist Moreno in confronting Alfonso. Farias explained to the jury how taking along another gang member shows that an act is being done in association with a gang: "Gang members tend to gain more confidence when there is another one present. A lot of times something may go wrong and they need somebody to back them up."

And Farias's expert opinion was supported by other evidence. Escalona acknowledged that he went to the Torch Room that day in order to serve as armed backup for Moreno. Escalona of course knew Moreno was a fellow member of the Neighborhood Norwalk gang. Escalona testified: "[Moreno] had told me to go – he was going to talk to this guy regarding a[n] issue right there, the dope business or whatnot." Asked what he knew about Alfonso, Escalona testified: "That he was right there calling himself a Candyman trying to sell drugs around that area." Escalona acknowledged that both he and Moreno brought guns with them when they went looking for Alfonso. In sum, the evidence before the jury tended to show that Escalona, a very junior gang member, had been summoned by Moreno, a much more senior gang member who was some 20 years older than Escalona, to assist him in what was expected to be a violent confrontation with a man suspected of selling drugs without permission in what Escalona knew to be Neighborhood Norwalk gang territory. Particularly damning was the evidence that Escalona only fired at Alfonso after Moreno yelled, "Shoot him, he's in our neighborhood." A reasonable jury could find that Escalona had acted with the specific intent to promote, further, or assist Moreno, his fellow gang member, in this criminal conduct.

13

Escalona contends Detective Farias was a biased witness and that her opinion "does not encompass the jury's finding" that Escalona acted in imperfect self-defense when he shot Alfonso. There is no merit to Escalona's *appellate* argument that Farias was biased in favor of the prosecution. It was for the jury to decide whether Farias's credibility was impaired by the fact she generally testified for the People. We will not revisit such a credibility determination on appeal.

Finally, Escalona asserts that, because the jury could have found him guilty of attempted voluntary manslaughter only on an imperfect self-defense theory, there was necessarily insufficient evidence to sustain the gang enhancement. This claim is without merit.

Escalona argues the imperfect self-defense finding means that the jury concluded his intent in shooting Alfonso was "to preserve his own life, which . . . does not satisfy the benefit to a gang element of the [gang] enhancement. . . . While the lack of intent to kill and/or malice do [*sic*] not have any direct bearing on the gang enhancement per se, it does reflect on the mental state that appellant necessarily had in regard to the gang enhancement. These mental states are inconsistent with the specific intent to benefit the gang, under cases that have defined the parameters necessary to find that intent." We do not agree.

Even if the guilty verdict and true finding on the gang enhancement were inconsistent, Escalona would not be entitled to a reversal of the enhancement finding. "As a general rule, inherently inconsistent verdicts are allowed to stand. [Citations.] For example, 'if an acquittal of one count is factually irreconcilable with a conviction on another, or if a not true finding of an enhancement allegation is inconsistent with a conviction of the substantive offense, effect is given to both.' [Citation.] . . . It is possible that the jury arrived at an inconsistent conclusion through 'mistake, compromise, or lenity.' [Citation.] Thus, if a defendant is given the benefit of an acquittal on the count on which he was acquitted, 'it is neither irrational nor illogical' to require him to accept the burden of conviction on the count on which the jury convicted. [Citation.]" (*People v. Avila* (2006) 38 Cal.4th 491, 600.) Therefore, the fact that the jury decided to

14

acquit Escalona of attempted murder has no bearing on whether there was substantial evidence to support the jury's true finding on the gang enhancement.

Moreover, "[t]he basic rationale of the doctrine [of imperfect self defense] is that a genuine belief in the need to defend oneself, even if unreasonable, negates the 'malice aforethought' which is required for a conviction of murder." (*People v. Hayes* (2004) 120 Cal.App.4th 796, 801, citing *People v. Flannel* (1979) 25 Cal.3d 668, 679-680; see also *In re Christian S.* (1994) 7 Cal.4th 768, 773-783.) A gang enhancement, however, has no element of malice aforethought that would be negated by an honest but unreasonable belief in the need to defend oneself. The required state of mind for the gang enhancement is that the defendant commit the crime "for the benefit of . . . [the] criminal street gang, with the specific intent to promote, further, or assist in any criminal conduct by gang members." (§ 186 .22, subd. (b)(1).) The mental states for voluntary manslaughter and a gang enhancement are not mutually exclusive. Escalona could have both intended to act for the benefit of his gang by serving as Moreno's armed backup, and also acted on the actual, but unreasonable, belief that he needed to shoot Alfonso in self-defense. (See, e.g., *People v. Goins* (1991) 228 Cal.App.3d 511, 517 ["One could have an honest but unreasonable belief in the necessity of self-defense and still have the specific intent to inflict great bodily injury [as alleged under § 12022.7]"]; see also *People v. King* (1991) 1 Cal.App.4th 288, 298 [principle "that an honest but unreasonable belief in the need to defend can negate malice is inapplicable to specific intent"].)

In sum, we conclude there was sufficient evidence to sustain the gang enhancement as to both defendants.

2. *Trial Court Did Not Improperly Coerce a Verdict from Escalona's Jury.*

Escalona contends the trial court improperly coerced a verdict when, in response to the jury's report that it was deadlocked, the court asked if the jury would like to review some evidence and provided a modified verdict form. There is no merit to this claim.

15

a. *Background*.

Escalona's jury began deliberating on Friday, November 21, 2014. The jurors retired for the weekend at 4:15 p.m. and resumed deliberations at 1:30 p.m. the following Monday. At 2:35 p.m., the jurors sent out a note saying they wanted to hear Alfonso's testimony, see the "video from when [the defendants] got dropped off," hear "Perkins' testimony from when he arrived," and "hear testimony re: [the bullet] casing in [Alfonso's] car." Within minutes, at 2:43 p.m., the jury sent out a second note stating: "Requesting to see judge to clarify the verdict forms."

At 4:00 p.m., the jury sent out a third note stating (verbatim): "Question for Judge. [¶] Do we need to agree all the items in question 2 that benefit of and the association with criminal street gang, with the specific intent to promote, further, and assist in criminal conduct by gang members within the meaning?" This jury note also contained the notation "code 186.22," which was an apparent reference to the gang enhancement statute (§ 186.22, subd. (b)).

The trial record next reflects that the jury entered the courtroom and the following colloquy occurred with the jury foreperson:

"Red Juror[6] Number 4: We're a bit confused on if we can't agree on attempted murder, do we all have to sign not guilty for attempted murder or can we direct[ly] proceed to the lesser charge for attempted voluntary manslaughter?

"The Court: Good question. No, you cannot go to the lesser until you resolve the greater. So if you convict on the greater, you stop there. If you acquit on the greater, then you go to the lesser. If you cannot acquit on the greater, you do not go to the lesser."

The judge then sent the jurors back to the jury room. They returned a short time later to announce they were deadlocked. The following exchange then took place:

"The Court: Let me ask you some questions, and please answer the questions and don't volunteer any information. Please don't volunteer which way you're leaning, if

---

**6** The jury for Escalona's trial was referred to as the "Red" jury, and the jury for Moreno's trial was referred to as the "Blue" jury.

16

indeed you are leaning one way or the other. [¶] Do you think that the jury is hopelessly deadlocked?

"Red Juror Number 4: Yes.

"The Court: Do you think that additional time might assist you and that it might be reasonably probable that you would reach a verdict if you had more time?

"Red Juror Number 4: No.

"The Court: Is there anything that the court can provide you that might assist you in reaching a verdict? Specifically, you sent me a request earlier asking for Mr. Alfonso's testimony.

"Red Juror Number 4: Yes.

"The Court: You wanted to see the video from when they got dropped off, Perkins' testimony from when he arrived at the Torch Room, you wanted to hear the testimony regarding the . . . casing in the car, defense Exhibit F. If I provide you with that, do you think that might be helpful and reasonably probable that you would reach a verdict with that?

"Red Juror Number 4: My opinion, no.

"The Court: I see you're having some discussion with your fellow juror. I can provide that to you or any or all of that.

"Red Juror Number 4: We can do it.

"The Court: You can do what?

"Red Juror Number 4: Can you provide it?

"The Court: Sure. Do you wish me to provide all four of those items or only some of those items?

"Red Juror Number 4: All four, please.

"The Court: All right. Please step back into the jury room."

It appears that, on the following day, November 25, the trial court submitted the following written response to the jury's earlier question about the verdict forms: "The requirements to prove the gang allegation are set forth in Jury Instruction number 1401.

17

[¶] Modified verdict forms which more accurately reflect the law as it applies to the gang allegation are being submitted to you."

The reporter's transcript next picks up during the morning session of November 25, with the trial court announcing it was inclined to provide the jury with modified verdict forms in response to its gang enhancement question. The court indicated that at several places in the instruction it was substituting the word "or" for the word "and," explaining: "The information has it in the conjunctive. It should have been in the disjunctive. The modification reflects the statute." The jury subsequently reached its verdicts.

b. *Discussion.*

Escalona essentially contends the trial court's statements amounted to an improper *Allen* dynamite charge (see *Allen v. United States* (1896) 164 U.S. 492 [17 S.Ct. 154] (*Allen*) – i.e., a statement designed to pressure minority jurors to reconsider their position in light of the majority's position in order to reach a verdict and to obviate the expense involved in retrying the case if a mistrial has to be declared. (See *People v. Gainer* (1977) 19 Cal.3d 835, 845, 852, fn. 16 (*Gainer*), disapproved on other grounds in *People v. Valdez* (2012) 55 Cal.4th 82, 163 [prohibiting use of "*Allen* charge" to break a jury deadlock].)[7]

In *Gainer*, our Supreme Court prohibited use of the so-called "*Allen* charge" or "dynamic charge" to break a jury deadlock, explaining: "The first and most questionable feature [of an *Allen* charge] is the discriminatory admonition directed to minority jurors to rethink their position in light of the majority's views. In the *Allen* opinion this concept is expressed in the following passage: 'if much the larger number were for conviction, a dissenting juror should consider whether his doubt was a reasonable one which made no

---

[7]    "A jury that has deliberated may be discharged without reaching a verdict when, 'at the expiration of such time as the court may deem proper, it satisfactorily appears that there is no reasonable probability that the jury can agree.' (§ 1140.) Whether the jury has had sufficient time to deliberate, and whether there is no reasonable probability of a verdict, are determinations committed to the sound discretion of the trial court. [Citations.]" (*People v. Price* (1991) 1 Cal.4th 324, 467.)

impression upon the minds of so many men, equally honest, equally intelligent with himself. If, upon the other hand, the majority was for acquittal, the minority ought to ask themselves whether they might not reasonably doubt the correctness of a judgment which was not concurred in by the majority.' [Citation.] . . . A second controversial element in *Allen*-type instructions, not approved in *Allen* itself, is the direction given by the court below that 'You should consider that the case must at some time be decided.' " (*Gainer*, *supra*, 19 Cal.3d at p. 845.)

*Gainer* held: "[I]t is error for a trial court to give an instruction which either (1) encourages jurors to consider the numerical division or preponderance of opinion of the jury in forming or reexamining their views on the issues before them; or (2) states or implies that if the jury fails to agree the case will necessarily be retried." (*Gainer*, *supra*, 19 Cal.3d at p. 852.) "A third common feature of *Allen*-type instructions is a reference to the expense and inconvenience of a retrial." (*Id.* at p. 852, fn. 16.)

Escalona also suggests the trial court erred by improperly commenting on the evidence. He cites *Quercia v. U.S.* (1933) 289 U.S. 466, 468-469, but that conviction was reversed because the trial court had charged the jury as follows: " 'And now I am going to tell you what I think of the defendant's testimony. You may have noticed, Mr. Foreman and gentlemen, that he wiped his hands during his testimony. It is rather a curious thing, but that is almost always an indication of lying. Why it should be so we don't know, but that is the fact. I think that every single word that man said, except when he agreed with the Government's testimony, was a lie. [¶] 'Now, that opinion is an opinion of evidence and is not binding on you, and if you don't agree with it, it is your duty to find him not guilty.' "

But Escalona's contention that the trial court improperly coerced a verdict is fundamentally misconceived because the trial judge neither gave anything remotely close to an *Allen* instruction, nor improperly discussed the trial evidence. Although the trial court did modify the verdict form relating to the gang allegation, all the court did was to correct a clerical error in the form that mistakenly set forth the elements of the gang

19

enhancement in the *conjunctive* instead of the *disjunctive*.[8] Further, the trial judge did not even attempt to *discuss* the evidence. Rather, the judge merely *referred* to particular items of evidence the jury had previously asked to see or hear, and inquired if having those materials might assist in reaching a verdict.

There was no error.

3. *Trial Court Did Not Err by Refusing to Dismiss One of Moreno's Jurors*.

Moreno contends the trial court erred when it rejected his motion to dismiss a juror after she expressed concern that the defendants were taking notes about her. There is no merit to this claim.

a. *Background*.

During the presentation of the People's case, one of Moreno's jurors communicated to the bailiff that she was concerned about the possibility the defendants might be taking notes about her. This was brought to the trial court's attention and the following colloquy occurred:

"The Court: The record should reflect that the court has received communication from the bailiff that juror number 9 in the Blue Jury has expressed some concern about the defendants taking notes, and she's a bit – she was nervous that the defendant [*sic*] might be taking notes regarding her. So we'll bring her in and talk to her. [¶] Let's bring in juror number 9, please." [¶] . . . [¶]

"The Court: You've expressed some concern to the bailiff about the taking of notes, et cetera?

"Blue Juror Number 9: Yes.

"The Court: Let me tell you a few things. One is your identity is secure. That is, it's not been disclosed. Any identifying information regarding you . . . remains sealed and is

---

[8]     The second amended information had mistakenly alleged that the shooting "was committed for the benefit of, at the direction of, *and* in association with a criminal street gang with the specific intent to promote, further *and* assist in criminal conduct by gang members." (Italics added.) But in each place the Penal Code says "*or*," not "*and*." (§186.22, subd. (b)(1).)

not available to anybody without my permission. The notes that you have will be destroyed. . . . [T]here's no ability to discover your identity. [¶] Having said that, let me ask you a couple of questions. Because of your concern, do you think that will inhibit you in deciding this case based solely on the facts? Will you still be able to decide the case based solely on the evidence presented?

"Blue Juror Number 9: Absolutely. It was just a question that I had.

"The Court: Okay. Did you express any of your concerns to any of the other jurors?

"Blue Juror Number 9: Right before I talked to the bailiff I asked if anybody else saw notes being taken. So I think it's probably something that everybody was concerned about.

"The Court: Okay. And was there any –

"Blue Juror Number 9: Nothing negative.

"The Court: Was there any – did you express to anybody any concern or fear that you had which would cause you to judge the case on anything other than based on the evidence?

"Blue Juror Number 9: No.

"The Court: And can you judge this case based solely on the evidence presented?

"Blue Juror Number 9: Absolutely."

When Moreno's attorney subsequently asked to have Blue Juror Number 9 removed from the jury, the trial court said, "That will be denied. It does not appear that her concerns will be a factor and will affect her ability to decide the case. She was – record should reflect she was very emphatic in that and even smiled when she said she'd be able to judge this case based on the facts."

After both juries were brought back into the courtroom, the trial court made this statement: "Before we start, let me tell you a few things regarding your . . . service and your anonymity. . . . [A]s you recall, we use numbers to identify you and that's how we identify you both by you're [*sic*] juror seat number and your juror identification number. All of your identifying information is sealed. It's not available to anyone. It's not available to either side. It is in the court file and it is sealed. Nobody has that identifying

21

information.  It's in the court record, and it is sealed.  [¶]  Any concern about your identification should be put to rest, because it is sealed and will not be disclosed without my permission."

### b. *Legal principles.*

"Section 1089 authorizes the trial court to discharge a juror at any time before or after the final submission of the case to the jury if, upon good cause, the juror is 'found to be unable to perform his or her duty.'  A trial court 'has broad discretion to investigate and remove a juror in the midst of trial where it finds that, for any reason, the juror is no longer able or qualified to serve.'  [Citation.]  A juror's inability to perform ' "must appear in the record as a 'demonstrable reality' and bias may not be presumed." [Citations.]'  [Citation.]  We review the trial court's determination for abuse of discretion and uphold its decision if it is supported by substantial evidence.  [Citation.]"  (*People v. Bennett* (2009) 45 Cal.4th 577, 621.)

### c. *Discussion.*

Moreno argues that Blue Juror No. 9's concern demonstrated her bias and that the appropriate remedy would have been to excuse her from the jury.  This conclusion is faulty, as demonstrated by a trio of California Supreme Court cases.

In *People v. Navarette* (2003) 30 Cal.4th 458, while the People were still putting on their case, Juror Todd R. gave the trial court a note asking if the defendant had access to the juror questionnaires, and expressing concern for his family.  Defense counsel raised the issue of this juror's ability to be impartial, and the court clerk reported that the juror "had indicated that other jurors shared his concerns."  (*Id.* at p. 500.)  Our Supreme Court affirmed the trial court's decision not to dismiss the juror:  "The court responded to the note in front of the entire jury, without privately discussing the note with Juror Todd R. and without permitting counsel to question him.  The court assured the jury that no one other than the court, the clerk, and counsel had seen the questionnaires, that they would be placed under seal, and that the identities of specific jurors would not be public information.  The court also encouraged the jurors that, if any of them felt unable to be 'fair' and 'unbiased,' to let the court know in writing.  [¶]  Defendant assumes that,

22

because the juror had concerns about his family's safety and the safety of his property, he was therefore biased against defendant, requiring his removal. The record belies this assumption. The court specifically asked the jurors to report if they could no longer be fair and unbiased, and Juror Todd R. did not pursue the matter further, apparently satisfied by the court's assurances. A decision whether to remove a juror for cause rests in the discretion of the trial court. [Citation.] We find no abuse of discretion." (*Ibid.*)

In *People v. Brown* (2003) 31 Cal.4th 518 (*Brown*), "[f]ollowing the penalty verdict, the prosecutor and both defense counsel joined the 12 jurors and discussed the case. All 12 jurors expressed concern that defendant's gang would retaliate against them as a result of the verdict. One juror in particular thought he may have been followed by a gang member or a member of defendant's family." (*Id.* at p. 581.) The defendant moved for a new trial based on jury misconduct, a motion the trial court denied. Our Supreme Court affirmed the trial court: "[W]e find the trial court did not abuse its discretion in declining to hold a hearing into potential jury misconduct. Although defense counsel's declaration indicated the jury was concerned about possible retaliation, it also states that a police detective active in the case assured the jury that defendant 'was no longer active in the gangs in Compton, and in fact, was not welcome in Compton due to problems that developed between [defendant] and his gang.' Moreover, when asked 'whether anger or fear connected with the jurors' concerns of retaliation affected their deliberations,' the jury foreperson replied in the negative. The prosecutor's declaration, which also stated that 'defense counsel attempted to elicit contrary information but were clearly informed that any relationship [defendant] had with a gang played no part in reaching [the jury's] decision in the guilt or penalty phase,' echoed this statement. Because defendant's evidence did not demonstrate 'a strong possibility that prejudicial misconduct has occurred' [citation], and no material fact was in dispute, the court's decision not to hold a hearing was well within its discretion." (*Id.* at p. 582.)

Then, in *People v. Manibusan* (2013) 58 Cal.4th 40 (*Manibusan*), the trial court was faced with a situation in which, on the second day of deliberations, the jury foreperson – Juror No. 58 – gave the trial court a letter stating that it " 'has been brought

23

to my attention that my anonymity as a juror for [this case] has been compromised.' " (*Id*. at p. 51.)  After explaining the circumstances in which this concern arose, Juror No. 58 said:  "Additionally, I became aware of the fact that my name has already been revealed to the members of [defendant's] family.  [¶]  As you may understand, this does not make me feel comfortable to continue as a juror in this case.  My safety and the safety of my family may be in jeopardy because of this incident.  Please accept my request to step down as a juror on this case." (*Ibid*.)  Upon questioning by the trial court, however, Juror No. 58 said "that she did not want the court to excuse her from the jury; that she was not concerned about the possibility of retribution for her jury service, and became less concerned the more she thought about it; that she had given the letter to the court just so it would be aware of the situation." (*Id*. at p. 52.)

The defendant asked the trial court to replace the juror with an alternate but the court refused, citing Juror No. 58's " 'answers and demeanor and finding 'no demonstrable reality that she [was] unable to perform her duties as a juror.' " (*Manibusan*, *supra*, 58 Cal.4th at p. 52.)  "Late that afternoon, the court received a note from the jury signed by Juror No. 58 stating:  'Can we switch from the original foreperson to the coforeperson for purposes of reading (and signing) the verdict(s)'  The court replied that the jury had discretion to change the foreperson during deliberations. Defendant then moved for a mistrial, arguing that the request was evidence Juror No. 58, despite her earlier assurance, was afraid to serve on the jury and had disclosed her concern to other jurors.  The trial court denied the motion, finding defendant's arguments to be unsupported speculation and commenting that requests for changes in jury forepersons 'come up all the time.' " (*Ibid*.)

On appeal, our Supreme Court rejected all of Manibusan's claims of error arising out of these events (including the trial court's alleged failure to adequately investigate the possibility of juror bias, as well as the court's subsequent denial of defendant's new trial motion):  "Defendant's claim fails.  As we have explained, 'not every incident involving a juror's conduct requires or warrants further investigation.' [Citation.]  'The decision whether to investigate the possibility of juror bias, incompetence, or misconduct – like

24

the ultimate decision to retain or discharge a juror – rests within the sound discretion of the trial court. [Citation.] The court does not abuse its discretion simply because it fails to investigate any and all new information obtained about a juror during trial. [¶] . . . [A] hearing is required only where the court possesses information which, if proven to be true, would constitute "good cause" to doubt a juror's ability to perform his duties and would justify his removal from the case. [Citations.]' [Citation.]" (*Manibusan*, *supra*, 58 Cal.4th at p. 53.)

*Manibusan* summed up its reasoning this way: "[D]efendant's claim fails because the premise underlying it – that a juror's fear of a defendant establishes bias or other grounds for discharge – is faulty. In [*Navarette*], we held that the trial court had not abused its discretion in declining to discharge a juror who had expressed fear of the defendant, explaining: 'Defendant assumes that, because the juror had concerns about his family's safety and the safety of his property, he was therefore biased against defendant, requiring his removal. The record belies this assumption. The court specifically asked the jurors to report if they could no longer be fair and unbiased, and [the juror in question] did not pursue the matter further . . . .' Again, given Juror No. 58's earlier verbal assurances to the court about her ability *as a juror* to deliberate impartially notwithstanding any fear of serving on the jury, the trial court did not abuse its discretion in concluding that the declarations did not warrant further inquiry into the issue. (See *Brown*, *supra*, 31 Cal.4th at pp. 581-582 . . . [trial court did not abuse its discretion in declining to conduct evidentiary hearing, notwithstanding declarations stating that '[a]ll 12 jurors expressed concern that defendant's gang would retaliate against them as a result of the verdict' and that one juror thought he might 'have been followed by a gang member or a member of defendant's family'].)" (*Manibusan*, *supra*, 58 Cal.4th at p. 56.)

The trial court here was satisfied that – despite Juror No. 9's expressed concern about the defendants taking notes – the court's questioning had clarified that this juror was able and willing to judge the case fairly. The trial court did not abuse its discretion by declining to dismiss Juror No. 9 from Moreno's jury.

**DISPOSITION**

The judgments are affirmed.

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

EDMON, P. J.

We concur:

ALDRICH, J.

LAVIN, J.